UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REGINA ODOM,                        )
                                 )
        Plaintiff,          )
                                 )
      vs.                       )   Case No. 4:16 CV 1265 ACL
                                 )
NANCY A. BERRYHILL,[1]       )
                                 )
Acting Commissioner of Social Security,  )
                                 )
        Defendant.     )

## MEMORANDUM

Plaintiff Regina Odom brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Odom's severe physical and mental impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. Procedural History

Odom filed an application for DIB on November 16, 2012, claiming that she became unable to work on September 20, 2009, because of fibromyalgia, kidney issues, neuropathy, endometriosis and "ovary issues," bursitis in both hips, tendonitis and left knee surgery, and migraines. (Tr. 73, 207.) Odom's claim was denied initially. (Tr. 85-89.) Odom subsequently amended her alleged onset of disability date to December 4, 2012. (Tr. 57.) Following an administrative hearing, Odom's claim was denied in a written opinion by an ALJ, dated May 26, 2015. (Tr. 9-20.) Odom then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 23, 2016. (Tr. 4, 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Odom argues that the ALJ's "findings of residual functional capacity do not find support in 'some' medical evidence as required under the standards contained in *Singh* and *Lauer*." (Doc. 16 at 4.)

# II. The ALJ's Determination

The ALJ found that Odom last met the insured status requirements of the Social Security Act on December 31, 2012, and did not engage in substantial gainful activity during the period from her alleged onset date of December 4, 2012, through her date last insured. (Tr. 11.)

In addition, the ALJ concluded that Odom had the following severe impairments through the date last insured: fibromyalgia; neuropathy; obesity; chondromalacia of the left knee; cervical degenerative disk disease; bipolar disorder; and depression. *Id.* The ALJ found that Odom did not have an impairment or combination of impairments that meets or medically equals the severity

of one of the listed impairments.   (Tr. 12.)

As to Odom's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is limited to sitting for four hours at a time, and eight hours in a work day.   The claimant is limited to stand/walk for two hours at a time, and six hours in a work day.   The claimant can frequently reach in all directions and handle, finger, feel, push, and pull with both upper extremities.   The claimant can frequently operate foot controls with both lower extremities.   The claimant can occasionally climb stairs, ramps, ladders and scaffolds.   The claimant can occasionally crawl.   The claimant can frequently balance, stoop, kneel, and crouch.   The claimant can have occasional exposure to unprotected heights and moving mechanical parts.   The claimant can have frequent exposure to humidity and wetness, extreme cold and vibration.   The claimant can frequently operate a motor vehicle.   Further, the claimant is limited to understanding, remembering, and carrying out simple instructions and making simple work related decisions and having occasional interaction with supervisors, co-workers and the public.

(Tr. 14.)

The ALJ found that Odom's allegations regarding the extent of her limitations were not entirely credible.   (Tr. 16.)   In determining Odom's physical RFC, the ALJ indicated that she was adopting the opinion of medical expert, Anne Winkler, M.D.   (Tr. 18.)

The ALJ further found that Odom was unable to perform past relevant work, but was capable of performing other jobs existing in the national economy, such as collator operator, mail clerk, and marker.   (Tr. 34-18-19.)   The ALJ therefore concluded that Odom was not under a disability, as defined in the Social Security Act, at any time from December 4, 2012, the alleged onset date, through December 31, 2012, the date last insured.   (Tr. 19.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on November 16, 2012, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act through December 31, 2012, the date last insured.

(Tr. 20.)

## III. Applicable Law

### III.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's

impairments.

6.      The testimony of vocational experts when required which is
        based upon a proper hypothetical question which sets forth the
        claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal

citations omitted).   The Court must also consider any evidence which fairly detracts from the

Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the

evidence, the Commissioner's findings may still be supported by substantial evidence on the

record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v.

Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a

whole, we must affirm the administrative decision, even if the record could also have supported an

opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation

marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th

Cir. 2003).

**III.B.   Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any other kind of substantial gainful

work which exists … in significant numbers either in the region where such individual lives or in

several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.   *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the

medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir.

2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§

404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

Odom argues that the RFC assessed by the ALJ is not supported by "some" medical evidence as required under the standards contained in *Singh v. Apfel,* 222 F.3d 448 (8th Cir. 2000) and *Lauer v. Apfel,* 245 F .3d 700, 704 (8th Cir. 2001).

As an initial matter, the Court notes that Odom's insured status is relevant in this case. Odom alleged an onset of disability date of December 4, 2012, and her insured status expired on December 31, 2012. To be entitled to benefits under Title II, Odom must demonstrate she was disabled prior to December 31, 2012. *See* 20 C.F.R. § 404.130. Thus, the period under consideration in this case is from December 4, 2012, through December 31, 2012.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. *Dunahoo v. Apfel,* 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *See Lauer,* 245 F .3d at 704 (8th Cir. 2001); *Singh,* 222 F.3d at 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer,* 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support

in the medical evidence in the record).

However, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted). Rather, the ALJ must base the RFC on all of the relevant evidence. *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).

Here, the ALJ properly formulated Odom's RFC after considering all of the relevant evidence, including the medical evidence. The ALJ first discussed the opinion of medical expert Anne Winkler, M.D. (Tr. 14.) Dr. Winkler responded to interrogatories on September 16, 2014, after reviewing the record. (Tr. 512.) Dr. Winkler found that the following impairments were established by the evidence: chondromalacia of the left knee, fibromyalgia, morbid obesity, psychiatric issues, GERD, nephrolithiasis, headaches, minimal osteoarthritis, minimal cervical degenerative disc disease, and hypertension. (Tr. 383.) Dr. Winkler found that none of Odom's impairments met or equaled any impairment in the listings, and explained that Odom has minimal osteoarthritis of the cervical spine and hips. (Tr. 513.) She stated that she would defer evaluation of Odom's psychiatric issues to a mental health expert. *Id.* Dr. Winkler expressed the opinion that Odom was capable of lifting and carrying up to ten pounds frequently, and twenty pounds occasionally; sitting for four hours at one time and a total of eight hours; standing for two hours at a time and a total of six hours; and walking two hours at a time and a total of six hours. (Tr. 516.) Dr. Winkler further found that Odom could frequently reach, handle, finger, feel, push and pull, use her feet, operate a motor vehicle, be exposed to dust and extreme temperatures, balance, stoop, kneel, crouch, and crawl; and only occasionally climb, crawl, and be exposed to unprotected heights and moving mechanical parts. (Tr. 517-19.) Dr. Winkler indicated that the limitations she found were first present on September 20, 2009. (Tr. 520.)

At the administrative hearing, Dr. Winkler testified that she had reviewed the record, including the following recently added exhibits: treatment notes of psychiatrist Netarajan Laks, M.D., dated June 2014 through February 2015; treatment notes and imaging reports from Sandra Hoffmann, M.D., dated November 2014 through March 2015; and treatment notes of Sajidul Ansari, M.D. dated February 3, 2014.  (Tr. 572-75.)   Dr. Winkler testified that nothing in this evidence changed her opinions provided in her responses to the interrogatories.  (Tr. 14, 53.)   Dr. Winkler stated that she did not consider Odom's psychiatric issues when providing her opinions, and noted that when an individual is "having significant psychological issues then certainly that can impact their perception of physical limits as well."  (Tr. 54.)   She testified that she did consider Winkler's pain.  *Id.*   Dr. Winkler stated:

> She has pretty mild changes in both her x-ray of her hips and her cervical spine.   Major pain probably would be from her fibromyalgia.   Although she also has some knee issues as well.   As you may be aware, fibromyalgia pain is a little different than say typical pain you see with say osteoarthritis.   It tends not to respond to narcotics, so we tend not to use those in people who have fibromyalgia. And it's really kind of an abnormal neurologic signal where they're getting signals that there's issues with pain.   In fact there shouldn't be that signal occurring on a regular basis.
> We have found and there's been multiple studies done that show that people with fibromyalgia really do best when they keep physically active and also mentally active.   Again sometimes the psychological issues will impact someone in terms of those sorts of things, but pain usually worsens when people do less and are not busy thinking about other things as well.   So it's a key component in terms of treatment.

(Tr. 54-55.)   Dr. Winkler testified that she had reviewed an EMG report, which revealed "a questionable maybe a C-8 radiculopathy," but subsequent MRIs "really looked fairly normal, which is why it wasn't really clear if she really had any nerve impingement."  (Tr. 55.)   Dr. Winkler stated that the results of this testing was "one of the reasons why I did limit her some in terms of function, because there was questionable abnormalities there."  *Id.*   Finally, Dr. Winkler testified that she had reviewed Dr. Hoffmann's notes indicating x-rays revealed significant

spurring in the cervical spine.   (Tr. 55-56.)   She testified that "her MRI actually looked like that, and we didn't see any nerve root impingement or spinal cord depression," although she stated that the spurring "could be causing some neck pain."   (Tr. 56.)

The ALJ accurately summarized Dr. Winkler's interrogatory responses and testimony in her opinion.   (Tr. 14, 17.)   The ALJ stated that "[t]he opinion of Dr. Winkler is adopted because Dr. Winkler is an accepted medical source who reviewed the claimant's medical records and her conclusions are largely consistent with the bulk of the evidence in the longitudinal file."   (Tr. 18.)

Odom argues that the ALJ erred in relying on Dr. Winkler's opinions because Dr. Winkler did not consider the effect of Odom's mental impairments on her perception of pain.   Odom notes that Dr. Laks found significant signs and symptoms resulting from her mental impairments. Odom further argues that the treatment notes of Dr. Hoffmann support greater physical limitations.

The ALJ conducted a thorough summary of the medical record.   The ALJ noted that Dr. Patterson diagnosed Odom with fibromyalgia, GERD, and depression on December 4, 2012.   (Tr. 15, 328.)   Dr. Patterson noted that Odom complained of numbness and tingling in her shoulders down to her fingers.   (Tr. 328.)   On April 17, 2013, Odom saw Michael Patterson, D.O., for a follow-up regarding her "depressive disorder not elsewhere classified," which was diagnosed four months prior.   (Tr. 15, 539.)   Odom complained of severe depression for the past three days, with symptoms of hypersomnia and crying spells.   (Tr. 539.)   She denied suicidal ideation, and reported that she was working part-time.   *Id.*   Odom also reported moderate fibromyalgia tender points, with episodic flare-ups and symptom-free periods in between.   *Id.*   Upon examination, Dr. Patterson noted Odom's affect and demeanor were appropriate.   (Tr. 15, 540.)   He diagnosed her with depressive disorder not elsewhere classified, fibromyalgia, and GERD.   (Tr. 541.) Odom presented to Dr. Patterson on September 11, 2013, at which time she reported severe

depression, with fleeting thoughts of suicide. (Tr. 15, 533.) She also complained of weakness, numbness in her hands and feet, and swelling in her joints, and stated that her fibromyalgia symptoms were worsening. *Id.* Odom reported a history of migraines without aura. *Id.* Odom owned an auction house, and was working part-time. *Id.* Upon examination, Odom's affect and demeanor were appropriate. (Tr. 15, 534.) Dr. Patterson prescribed Hydrocodone,[2] Tramadol,[3] Viibryd,[4] and Toradol.[5] (Tr. 535.)

On December 23, 2013, Odom presented to Steven Kurzweil, M.D., at Premier Surgical Associates, with complaints of abdominal pain. (Tr. 15, 410.) Upon examination, Odom had normal range of motion of the spine, a normal gait, a normal sensory and motor exam, normal strength, no tenderness, and normal range of motion of the extremities. (Tr. 15, 411.) Dr. Kurzweil diagnosed Odom with cholelithiasis without obstruction, and recommended a laparoscopic cholecystectomy. *Id.* Odom underwent the laparoscopic cholecystectomy on December 26, 2013, and tolerated the procedure well. (Tr. 15, 413.)

The ALJ noted that Odom presented to Dr. Ansari at St. Louis Gastroenterology Consultants on February 3, 2014, with complaints of GERD. (Tr. 15, 572.) Dr. Odom noted no abnormalities on examination of the abdomen, extremities, or musculoskeletal system. (Tr. 15, 574.) Odom's mood and affect were appropriate. (Tr. 15, 575.)

---

[2] Hydrocodone contains a combination of an opioid (narcotic) pain reliever—hydrocodone—and a non-opioid pain reliever—acetaminophen. *See* WebMD, http://www.webmd.com/drugs (last visited September 27, 2017).

[3] Tramadol is a non-opioid analgesic. *See* WebMD, http://www.webmd.com/drugs (last visited September 27, 2017).
[4] Viibryd is indicated for the treatment of depression. *See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).
[5] Toradol is a nonsteroidal anti-inflammatory drug. *See* WebMD, http://www.webmd.com/drugs (last visited September 25, 2017).

Odom presented to Dr. Hoffmann on April 23, 2014, upon the referral of Dr. Patterson, for evaluation of fibromyalgia.  (Tr. 15, 424.)   Odom reported that she hurt all over and felt miserable, had difficulty sleeping, was nonfunctional, and had lost the business she owned because she could not maintain it due to chronic pain and severe fatigue.   *Id.*   She also reported that she had been diagnosed with bipolar disorder earlier that year after becoming manic and suicidal and being hospitalized.   *Id.*   Upon examination, Odom had normal motor strength of the upper and lower extremities, intact sensory exam, normal range of motion of the spine, and she was alert and cooperative with the exam.   (Tr. 15, 425.)   Dr. Hoffmann noted fibromyalgia tender points of the cervical, thoracic, and lumbar spine; shoulders; hips; and knees.   *Id.*   She diagnosed Odom with polyarthralgia, fibromyalgia, cervical degenerative disc disease, and bipolar disorder unspecified. *Id.*   Dr. Hoffmann indicated that x-rays of the cervical spine showed "large spurs at C5/6/7," which required further evaluation.   *Id.*   Dr. Hoffmann ordered an MRI, sleep study, and nerve conduction tests.   (Tr. 425-26.)

Odom underwent nerve conduction testing in May 2014, which was "basically a normal NCV/EMG of [the] bilateral upper extremities," although there were "soft signs for C8-T1 radiculopathy."   (Tr. 444.)   An MRI of the cervical spine was recommended by the interpreting physician.   *Id.*

Dr. Laks completed a Mental Residual Functional Capacity Questionnaire on July 20, 2014.   (Tr. 463-67.)   He indicated that he had seen Odom on four occasions since January 2014, and that he had diagnosed her with bipolar disorder, with a GAF score of 50.[6]   (Tr. 16, 463.)   Dr.

---

[6]   A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("DSM IV-TR").

Laks stated that Odom was taking Abilify,[7] and that her mood swings were "somewhat better" with treatment. *Id.* Dr. Laks indicated that the following clinical findings demonstrate the severity of Odom's mental impairments: tired, wants to sleep more, changes moods for no reason, labile affect, non-psychotic, denies violent conduct, and insight and judgment are fair. *Id.* He identified the following signs and symptoms: anhedonia, generalized persistent anxiety, mood disturbance, difficulty thinking or concentration, intense and unstable interpersonal relationships and impulsive and damaging behavior, flight of ideas, deeply ingrained maladaptive patterns of behavior, inflated self-esteem, and a history of multiple physical symptoms for which there are no organic findings that have caused the individual to take medicine frequently. (Tr. 464.) When asked to provide his opinion regarding Odom's ability to do work-related activities, Dr. Laks stated: "I am not trained for disability evaluation." *Id.*

Odom presented to Dr. Hoffmann on January 29, 2015, at which time she complained of extreme pain in her left shoulder, which had been occurring for two months. (Tr. 16, 563.) Dr. Hoffmann stated that x-rays revealed significant spurring at C5/6/7, and she noted tenderness and pain on motion. (Tr. 563-64.) She ordered an MRI of the cervical spine. *Id.* Odom also reported left arm numbness. *Id.* Dr. Hoffmann stated that there was no clear pathology in terms of bony pathology, but ordered an MRI of the left shoulder to rule out a torn soft tissue structure due to Odom's limited range of motion on examination. *Id.* Odom underwent an MRI of the cervical spine on March 10, 2015, which was negative. (Tr. 568.) The MRI of Odom's left shoulder revealed tendinosis of the rotator cuff attachment. (Tr. 569.)

The medical evidence summarized above supports Dr. Winkler's opinion that, since September 20, 2009, Odom was capable of performing a limited range of light work. Dr.

---

[7]   Abilify is an antipsychotic drug indicated for the treatment of bipolar disorder, schizophrenia, and depression. *See* WebMD, http://www.webmd.com/drugs (last visited September 27, 2017).

Winkler's opinion was based on the objective testing, consisting of an EMG revealing only questionable radiculopathy at C-8 and a subsequent normal cervical MRI. (Tr. 55, 444, 568.) Dr. Winkler stated that she had considered Dr. Patterson's December 2012 treatment notes documenting Odom's complaints of numbness and tingling in the extremities, and that she limited Odom accordingly. (Tr. 55, 328.) Dr. Winkler further stated that she had considered Odom's complaints of pain when determining her limitations. (Tr. 55.) The treatment notes reveal that, despite Odom's complaints of pain related to fibromyalgia and arthritis, her physical examinations routinely noted normal range of motion and strength. (Tr. 411, 574, 425.)

Odom argues that Dr. Hoffmann's records noting significant spurring on x-rays supports the presence of greater limitations than found by the ALJ. The undersigned disagrees. First, Odom underwent the cervical x-rays documenting spurring on April 23, 2014, more than fifteen months after the expiration of her insured status. (Tr. 453.) Second, Dr. Winkler specifically testified that she had reviewed this evidence and that it did not change her opinion. (Tr. 56.) Dr. Winkler explained that Odom's subsequent MRI revealed no nerve root impingement or spinal cord depression. *Id.* In addition, Dr. Hoffmann found on examination that Odom had normal motor strength of the upper and lower extremities, intact sensory exam, and a normal range of motion of the spine. (Tr. 15, 425.) Contrary to Odom's argument, Dr. Winkler's general statement that spurring "is an objective finding, and yes, it could be causing some neck pain," does not detract from Dr. Winkler's opinion. There is no evidence that Odom experienced disabling neck pain resulting from spurring at any time, much less prior to December 31, 2012.

Odom also contends that the ALJ's physical RFC determination is not supported by the record because the ALJ did not consider the effect of Odom's mental impairments on her

perception of pain.   She further argues that Dr. Laks' findings "calls into significant question the conclusions reached" in the ALJ's mental RFC determination.   (Doc. 16 at 10.)

The ALJ found that the evidence of record fails to demonstrate her mental impairments preluded her from performing all work.   (Tr. 17.)   The ALJ acknowledged the significant symptoms found by Dr. Laks in July 2014, including anxiety, mood disturbance, and difficulty concentrating.   (Tr. 17, 464.)   Notably, this evidence is dated over a year-and-a-half after the expiration of Odom's insured status.   Dr. Laks indicated that he did not start seeing Odom until January 2014.   (Tr. 463.)

The ALJ discussed Dr. Patterson's April 2013 treatment notes, in which he stated that Odom had been diagnosed with "depressive disorder not elsewhere classified" four months prior, and complained of increased symptoms the past three days.   (Tr. 17, 539.)   Odom denied suicidal ideation, and reported that she was working part-time.   *Id.*   Upon examination, Odom's affect and demeanor were appropriate.   (Tr. 540.)   In September 2013, Odom complained of increased depression with thoughts of suicide, but was still working part-time and her affect and demeanor were appropriate on examination.   (Tr. 17, 533-34.)   The ALJ also pointed out that Dr. Ansari found Odom's mood and affect were appropriate on February 3, 2014.   (Tr. 17, 575.)   The evidence of record does not demonstrate Odom's mental impairments were disabling during the relevant period.

As to Odom's allegation that the ALJ did not consider the effect of her mental impairments on her perception of pain, the ALJ found that Odom's subjective allegations of pain and limitations were not entirely credible.   (Tr. 16-17.)   Before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility.   *Wagner v. Astrue,* 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v.*

*Barnhart,* 403 F.3d 953, 957 (8th Cir. 2005). Credibility questions are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003).

The ALJ first found that the objective findings and treatment notes of the examining physicians failed to corroborate Odom's allegations of disabling pain or mental limitations. (Tr. 16.) An ALJ may consider the lack of objective medical evidence supporting a plaintiff's subjective complaints as one factor in assessing credibility. *Forte v. Barnhart,* 377 F.3d 892, 895 (8th Cir. 2004). As previously discussed, this finding is supported by the record. Although the medical evidence supports Odom's complaints of pain resulting from fibromyalgia and orthopedic impairments, the medical evidence as a whole belies her allegations to the extent she claims disabling limitations between December 4 and 31, 2012.

The ALJ also considered Odom's daily activities and found that they were inconsistent with her allegations of total disability. (Tr. 17.) The ALJ cited Odom's testimony in her January 2013 Function Report that she provides care for her brother-in-law who has cerebral palsy; cares for her two sons, one of whom has autism; takes care of two puppies; prepares light meals; performs household chores; shops for groceries a few times per month; socializes with her husband and children; reads books; and watches movies. (Tr. 17, 237-44.) While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Odom's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. *See Clevenger v. Soc. Sec. Admin.,* 567 F.3d 971, 976 (8th Cir. 2009) (recognizing that cases send mixed signals about significance of daily activities, but noting claimant reported she engaged in an array of activities; it was not unreasonable under case law for ALJ to rely on this evidence to infer claimant's assertion of disabling pain was not entirely credible); *Pirtle v. Astrue,*

479 F.3d 931, 935 (8th Cir. 2007) (claimant's ability to homeschool her two children was inconsistent with allegation of disability); *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir. 2004) (ALJ properly considered that plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible).

In addition, Odom reported to Dr. Patterson in April 2013 and September 2013, both after her alleged onset of disability, that she was still working part-time as she owned an auction house. (Tr. 15, 539, 533.)   Work activity can detract from a claimant's credibility.   *See* 20 C.F.R. §§ 404.1571, 416.971 (past work may show ability to work at the substantial gainful activity level); *Goff v. Barnhart,* 421 F.3d 785, 792 (8th Cir. 2005) (inconsistencies between subjective complaints and work and daily activities diminished claimant's credibility); *Harris v. Barnhart,* 356 F.3d 926, 930 (8th Cir. 2004) ("It was ... not unreasonable for the ALJ to note that [the claimant's] daily activities, including part-time work, ... were inconsistent with her claim of disabling pain.").

The ALJ's RFC determination is supported by substantial evidence in the record as a whole.   The ALJ properly considered the medical evidence, as discussed above.   The ALJ's finding that Odom retained the physical capacity to perform a limited range of light work is supported by the opinion of medical expert Dr. Winkler, and the other medical evidence of record noting few abnormalities on examination.   The ALJ adequately took into account Odom's mental impairments in further limiting her to understanding, remembering, and carrying out only simple instructions; making simple work-related decisions; and having only occasional interaction with supervisors, co-workers and the public.   Odom cites to no evidence supporting the presence of greater limitations during the relevant period.   Odom's statements regarding her daily activities and ability to work part-time during the relevant period also support the ALJ's determination.

The undersigned acknowledges that there is evidence that tends to support limitations more significant than those in the RFC; however, that evidence is dated *after* Odom's date last insured and is therefore of less relevance. The relevant question before the ALJ concerned only Odom's medical conditions and limitations prior to the date last insured. *See Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014) (citing *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997)) (if social security disability claimant is not insured for Title II purposes, the Court only considers the claimant's medical condition as of her date last insured); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)) (to be entitled to benefits, social security claimant must establish that she was disabled prior to the expiration of her insured status). Further, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because [the Court] would have decided the case differently." *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

Finally, Odom argues that the hypothetical question posed to the ALJ was erroneous because it did not include all of her allegations of pain and limitations. As previously discussed, the ALJ found that Odom's subjective allegations were not entirely credible. The hypothetical question the ALJ posed to the vocational expert was based on the RFC formulated by the ALJ, which accounted for all of Odum's credible limitations. Consequently, the hypothetical question posed to the ALJ was proper. *See Martise,* 641 F.3d at 927 ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006)).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

_____

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 29th day of September, 2017.